UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 18-629(DSD/DTS)

Anthony Joseph Tenerelli,

        Plainitiff,

v.                                              **ORDER**

United States of America; and
Dr. Lon Krieg,

        Defendants.


        Vincent J. Moccio, Esq. and Bennerotte & Associates, P.A.,
        3085 Justice Way, Suite 200, Eagan, MN 55121 and Brandon
        Thompson, Esq. and Ciresi Conlin LLP, 225 South 6th Street,
        Suite 4600, Minneapolis, MN 55402, counsel for plaintiff.

        Friedrich A. P. Siekert, United States Attorney's Office, 300
        South 4th Street, Suite 600, Minneapolis, MN 55415, counsel
        for defendants.


        This matter is before the court upon defendant Dr. Lon Krieg's

motion for summary judgment.  After a review of the file, record,

and proceedings herein, and for the following reasons, the motion

is granted.


**BACKGROUND**

        Anthony Joseph Tenerelli is a federal inmate who has been

housed at the Federal Medical Center (FMC) Rochester since 2012.

Kolar Decl. Ex. A, at 1.  Krieg is a physician at FMC Rochester

and Tenerelli was his patient from 2012 through the time period

relevant here.  See id. at 2.  After complaining of back pain and

other symptoms for months, in February 2016, Tenerelli was diagnosed with and began treatment for multiple myeloma, a type of cancer that affects the bone marrow and can cause tumors. See generally id. Tenerelli asserts that Krieg violated his Eighth Amendment right because, in the months leading up to the diagnosis, Krieg was deliberately indifferent to the signs and symptoms that Tenerelli argues made clear that he was suffering from a serious medical condition.[1] See generally Compl. Krieg disputes that he was deliberately indifferent to Tenerelli's serious medical need and contends that he is entitled to summary judgment based on qualified immunity. See generally Def.'s Mem. Supp. Summ. J., ECF No. 54.

## I.   Relevant Medical Concepts

Back pain is a common ailment, the cause of which can be difficult to diagnose. Flynn Decl. ¶ 4.[2] Patients suffering from back pain most often have a benign condition such as degenerative disc disease. See Schorer Aff. ¶ 41; Taylor Aff. ¶ 56. Although

---

[1]  Tenerelli has brought two claims in this suit: one against the United States of America for liability under the Federal Tort Claims Act (FTCA), and one against Krieg for liability under the Eighth Amendment. Only the Eighth Amendment claim against Krieg is at issue here; the parties do not dispute that Krieg is not liable under the FTCA.

[2]  Paragraphs cited from the declaration of Dr. Flynn are in reference to the section of the declaration titled "Relevant Medical Concepts."

degenerative conditions are not as common in the thoracic spine as they are in the cervical or lumbar spine,[3] they are not unheard of, and thoracic spine pain is found more frequently in patients with a history of lumbar and cervical spine problems.  See Schoon Decl. ¶ 2;[4] Schorer Aff. ¶ 40; Taylor Aff. ¶ 55.  In addition to degenerative conditions, there are a number of conditions that doctors should consider when diagnosing the cause of back pain, including — but not limited to — vertebral fractures, nerve root impingement or spinal cord compression caused by things such as a herniated disc or tumor, and cancer.  See Schorer Aff. ¶¶ 41–43; Flynn Decl. ¶ 3.  Although cancer should be a part of the differential diagnosis when trying to find the cause of back pain,[5] "myeloma is rarely the cause" of such pain.  Hellerstein Aff. 3.

Patients who complain of chest pain most often suffer from conditions relating to the structures or organs found in the chest.  Flynn Decl. ¶ 2.  Chest pain can be caused by, among other things, heart disease; pericarditis, an inflammation of the sac around the

---

[3]  A patient's cervical spine is in the neck, the thoracic spine extends from the base of the neck to roughly the middle of the back, and the lumbar spine extends from the middle of the back to the sacrum.  See Schorer Aff. ¶ 39.

[4]  Paragraphs cited from the declaration of Dr. Schoon are in reference to the section of the declaration titled "Relevant Medical Concepts."

[5]  A differential diagnosis is the process by which a physician considers various conditions that may be causing a patient's symptoms.  See, e.g., Krieg Dep. 39:17–19.

heart; pleuritis, an inflammation of the lining between the lungs and rib cage; esophagitis, an inflammation of the esophagus; gastroesophageal reflux disease (GERD); costochondritis, an inflammation of the cartilage connecting the ribs to the sternum; and structural issues with the sternum or ribs, including those issues that can result from trauma.  Id.; Schoon Decl. ¶ 5.

Multiple myeloma (MM) is a cancer of the plasma cells that proliferates in the bone marrow and causes the bone to weaken. Schorer Aff. ¶ 44.  MM sometimes causes tumors in the spine.  Id. Patients with MM can present with myriad symptoms, including anemia, bone pain, fatigue, generalized weakness, weight loss, neurologic symptoms, hypercalcemia, and elevated creatinine or serum protein.  Id.; Flynn Decl. ¶ 6.

**II.  Tenerelli's Relevant Medical History**

Tenerelli was diagnosed with antisocial personality disorder (APD) in 2009.  Kolar Decl. Ex. A, at 5.  Tenerelli's APD presented as a feeling that the medical health care system had let him down and resulted in a tendency to blame others for his health problems. Id.  At a psychiatric evaluation in 2012, the provider noted that Tenerelli had delusions regarding physical ailments that would make "sorting out medical issues more difficult."  Id. at 5-6. Beyond mere evaluation, Tenerelli refused psychiatric treatment. Id.

Tenerelli's medical records indicate that he has suffered from pain in his neck and lower back for years. See id. at 1. Tenerelli normally attributed that pain to a 1984 car accident. See, e.g., id. at 1, 2, 4, 5. At least as far back as 2012, Tenerelli complained intermittently of numbness and tingling in his legs. Id. at 2-4. Tenerelli also noted difficulty sleeping due to his back pain, sometimes only getting two to three hours of sleep a night. See, e.g., id. at 4. At times, he rated his neck and low back pain as a ten out of ten on the pain scale or stated that his pain was so bad that he could not walk. Id. at 6, 8.

In September 2012, Tenerelli began complaining of a chronic cough that caused chest pain. Id. at 6. Along with his cough, Tenerelli reported a "chronic vise-grip sensation in the bone and neck pain," as well as fever, chills, and night sweats. Id. At a September 2012 chronic care encounter, Krieg noted that Tenerelli was observed in the waiting room without exhibiting a cough. Id. On entering the exam room, Tenerelli began coughing frequently. Id. Tenerelli's complaints regarding his chronic cough continued off and on from 2012 through early 2015. Id. at 6-10.

### III. Tenerelli's Medical Treatment May 2015 – January 2016

On May 11, 2015, Tenerelli visited Krieg for a chronic care encounter and complained of a persistent cough, which he stated had been ongoing for three years, and pain in his sternum that he

stated had started three weeks earlier.[6]  Moccio Decl. Ex. 2, at
4.[7]  Tenerelli also complained of shortness of breath, night
sweats, and headaches, and stated that it felt like something was
stuck in his throat.  Id.  Chest x-rays performed in March and
April of 2015 did not reveal a cause for Tenerelli's cough, so
Krieg prescribed ranitidine to determine whether nighttime reflux
was the cause.  Id. at 5.  On May 15, Tenerelli presented with
pain in his chest and back that he rated a ten out of ten on the
pain scale.  Id. at 7.  The doctor prescribed prednisone,
lorazepam, and oxycodone to help with the pain.  ECF No. 52-4, at
5.[8]

Although Tenerelli reported on May 18 that his cough had
dissipated and his pain had improved, by May 21 the pain in his

_____

[6]    Numerous different providers at FMC Rochester saw and
evaluated Tenerelli throughout the period in question.  As his
primary treating physician, Krieg was responsible for reviewing
the notes and assessments of these other providers, and for
coordinating Tenerelli's overall care.

[7]    Exhibit 2 of the Moccio declaration contains Tenerelli's
Bureau of Prisons (BOP) medical records, which include three
different page numbering systems: the page number assigned through
CM/ECF, the Bates number, and the exhibit page number.  For ease
of reference and clarity, the court cites to the exhibit page
number.

[8]    ECF No. 52 is the Kolar declaration, which contains one
exhibit summarizing Tenerelli's BOP medical records — attachment
1 — and eighty-five separate parts consisting of Tenerelli's BOP
medical records — attachments 2-86.  For example, ECF No. 52-4 is
part 3 of the Kolar declaration.  For ease of reference and
clarity, the court will cite to the document and page numbers
assigned in ECF.

chest and back had returned at an eight out of ten on the pain scale.  ECF Nos. 52-5, at 1; 52-6, at 1.  The provider on call ordered another x-ray and renewed the prescriptions for lorazepam and oxycodone.  ECF No. 52-6, at 3.  Tenerelli's pain continued throughout May, so on May 28 a provider ordered an H. pylori test to determine whether GERD was causing the pain.  ECF No. 52-9.  On May 29, Tenerelli reported that his pain had improved and that he felt the prednisone had helped.  ECF No. 52-10, at 1.  He further reported that the pain in his chest was "pretty much gone," and that the only pain remaining was in his back.  Id.

Tenerelli was seen four times in June of 2015, and continued to complain of pain in his chest and back that was, at times, relieved by ibuprofen.  See ECF Nos. 52-11, 52-12, 52-13, 52-14.  At a physical therapy appointment on June 16, Tenerelli noted his chest pain and attributed it to his chronic cough.  ECF No. 52-11, at 1.  The provider included a note that he had observed Tenerelli over the past week and had not noted any "pain behaviors, altered movement, or facial grimacing."  Id. at 2.  At an evaluation on June 18, the provider noted his belief that Tenerelli's pain likely was not related to gastrointestinal (GI) issues but rather costochondritis, which can last six to twelve months.  ECF No. 52-12, at 2.  The provider also noted that the symptoms could also be caused by osteomyelitis, an infection of

the bone, which the provider would consider if the pain persisted.
Id.

Tenerelli's pain continued into July.  On July 6, Tenerelli
stated that his chest pain was a "7+" out of ten on the pain scale.
ECF No. 52-15, at 1.  The provider noted that a GI telemedicine
consult had been approved pending scheduling.  Id.  The provider
also ordered an erythrocyte sedimentation rate (ESR) test and a
test to detect blood in Tenerelli's stool.  Id. at 3.  An ESR test
"is a broad but non-specific measurement for inflammation,
infection, and a variety of conditions that produce abnormal
proteins in the blood such as certain cancers and auto-immune
diseases like rheumatoid arthritis and lupus."  Hellerstein Aff.
9.  A normal ESR is between zero and fifteen millimeters per hour;
Tenerelli's came back at a fifty-eight.  See Krieg Dep. 88:19; ECF
No. 52-30, at 3-4.

On July 9, Tenerelli had a gastroenterology consult at the
Mayo Clinic.  ECF No. 52-16.  The consulting physician's initial
impression was that Tenerelli's pain was caused by GERD, and the
provider ordered an endoscopy "to determine whether [Tenerelli
had] esophagitis or a stricture."  Id. at 1.

On August 26, an endoscopy revealed a two-centimeter hiatal
hernia and LA Grade A esophagitis.  ECF No. 52-18.  At a sick call
encounter on August 31, Tenerelli stated that his pain was between
an eight and a nine.  ECF No. 52-19.  Although the provider noted

that Tenerelli did not appear to be in pain, he did appear distressed and the provider noted that pain was detected on palpation. Id. at 2. Krieg evaluated Tenerelli the next day. ECF No. 52-20. Tenerelli reported that certain foods seemed to exacerbate his pain; Krieg adjusted his medication to help with the diagnosed esophagitis. ECF No. 52-20, at 3. At a physical therapy appointment on September 3, Tenerelli stated that his pain was typically between a six and an eight during the day, and between nine and ten at night. ECF No. 52-21, at 1. The provider stated that Tenerelli had complied with his physical therapy routine, and that she did not think the cause of his pain was musculoskeletal in nature. Id. She advised Tenerelli that his pain was likely due to his diagnosed esophagitis. Id. at 2.

Tenerelli continued to report his pain throughout September. At an evaluation encounter on September 5, Tenerelli noted his pain but stated that he did not have any shortness of breath, nausea, diaphoresis, or pain in his arms. ECF No. 52-22, at 1. The provider noted that Tenerelli's symptoms remained consistent with his diagnosed esophagitis. Id. At a sick call encounter on September 8, Tenerelli reported that his pain was a nine, however the provider noted that Tenerelli appeared well, and did not appear agitated, distressed, or to be in pain. ECF No. 52-23, at 1, 2. In mid-September, Tenerelli was twice given a GI cocktail that included maalox and lidocaine, which helped relieve his pain both

times.   See ECF Nos. 52-24, 52-25, 52-26.   After evaluating Tenerelli on September 15 at a chronic care encounter and discussing his pain and medications, Krieg noted that his own "objective observations and findings continue to be significantly inconsistent with [Tenerelli's] subjective complaints." ECF No. 52-26, at 3.   On September 17, Krieg referred Tenerelli for psychological assessment because he felt that Tenerelli's "behavioral health issues are obviously impairing his ability to deal with some of his medical issues." ECF No. 52-27, at 1.

On September 21, Tenerelli reported to sick call with "severe back and chest pain" that he rated as a ten on the pain scale. ECF No. 52-29, at 1.   Tenerelli also reported not being able to move his left arm well.   Id.   The provider noted on exam that his left arm was, at times, weaker than his right arm, but that this finding was inconsistent.   Id. at 3.   When Tenerelli returned to sick call on September 23 with "debilitating" chest and back pain, the provider noted that he did not appear to be in pain.   ECF No. 52-30, at 1, 3.   The provider ordered x-rays of Tenerelli's back and neck as well as numerous labs, including an ESR test.   Id. at 4.   The x-ray taken on September 25 revealed degenerative hypertrophic changes in Tenerelli's lower cervical spine and throughout his thoracic spine.   ECF No. 52-31.

Tenerelli was seen by a nurse on September 25 and 27, and reported pain in his chest and back and weakness in his left arm

both times.  ECF Nos. 52-32, 52-34.  At the first encounter, the
nurse noted that although Tenerelli reported not being able to
lift his left arm past his shoulder, she had seen him do just that
minutes earlier.  ECF No. 52-32, at 2.  Tenerelli also reported
that his whole body felt numb, but then stated that was normal for
him.  Id.  Despite his assertion that total-body numbness was
normal for him, at the second encounter Tenerelli reported a "new
development" that his left side was completely numb.  ECF No. 52-
34, at 1.  The provider noted that Tenerelli was able to move his
left side normally and that his gait was steady.  Id. at 2.

By September 28, Tenerelli's lab results had come back with
an ESR of eighty-eight.  ECF No. 52-35, at 2.  Tenerelli was seen
that day at sick call and reported that his back and chest pain
was at a level ten and that he was still numb on his left side.
Id. at 1.  The provider noted that Tenerelli did not appear to be
in pain, that he sat with a relaxed posture, that he did not
demonstrate any guarding or rigidity, and that he was able to arise
from his chair without difficulty.  Id. at 2.  The provider advised
Tenerelli that he thought polymyalgia rheumatica (PMR) may be the
cause of his pain, and he ordered a prescription for prednisone to
help with Tenerelli's back pain and new labs to test for rheumatic
diseases.  Id. at 3.

Tenerelli returned to sick call on October 5 reporting that
his pain was between an eight and nine and that the numbness on

11

his left side persisted. ECF No. 52-36. The provider observed that Tenerelli seemed relaxed and did not appear to be in pain even when demonstrating movement in areas in which he complained of pain. Id. at 2. The provider requested a rheumatology consult at the Mayo Clinic based on his belief that PMR was causing Tenerelli's pain. Id. at 3. On October 13, a new ESR test was ordered because of Tenerelli's previously elevated results. ECF No. 52-37. At a sick call encounter on October 19, Tenerelli noted that the prednisone was helping to decrease his pain. ECF No. 52-38. The provider noted that his ESR was down to 24 and that he had a rheumatology appointment pending in December. Id.

On November 9, Tenerelli presented for a follow up on his chronic pain and reported that his pain was improved and that he could move with much less pain. ECF No. 52-41. The provider noted that Tenerelli did not appear to be in any acute pain at that time. Id. at 2. Tenerelli's prescription for prednisone was continued through November. See id.; ECF No. 52-42.

Tenerelli was seen at the Mayo Clinic for a rheumatology consult on December 3. ECF No. 52-44. After an exam and a review of Tenerelli's history, the provider stated that he was not sure that Tenerelli's pain was related to his elevated ESR, nor did he believe the pain was caused by PMR or another inflammatory spine disease. Id. at 2. The provider believed there was a mechanical component to Tenerelli's pain and recommended a radionuclide bone

scan to determine whether there was evidence of an "osteoid, osteoma, or other lesion of concern." Id. at 3. He noted that a serum protein electrophoresis (SPE) test could also be considered. Id. By December 8, providers at FMC Rochester had requested the recommended radionuclide bone scan and were awaiting scheduling of the procedure.[9] ECF No. 52-45, at 1.

Tenerelli continued to complain of pain and numbness throughout December. At an encounter on December 8, the provider noted that Tenerelli did not appear to be in pain, but advised him to "return immediately if [his] condition worsens." Id. at 1, 2. On December 15, Tenerelli reported pain in his chest and back at a level eight and complained of night sweats that he stated he had had for years. ECF No. 52-46, at 1. The provider noted that Tenerelli did not appear in pain, but that he detected pain on palpation of Tenerelli's chest and back. Id. at 4. At a visit with Krieg on December 22, Tenerelli reported that his pain and numbness were getting worse. ECF No. 52-48. Tenerelli moved slowly and winced "as though to portray severe pain," but then abandoned those behaviors when describing his symptoms. Id. at 4.

---

[9] When providers at FMC Rochester request a consultation or testing that can only be done at the Mayo Clinic, it must first be approved by the clinical director of the prison. Krieg Dep. 15:8–15. Once the request is approved, scheduling the visit often depends on myriad factors including lockdowns or closures at FMC Rochester, the number of outside visits already scheduled on a particular day, and the staffing schedules of correctional officers needed to accompany inmates. Id. at 19:6–18.

An exam revealed normal strength in Tenerelli's arms and legs, and Krieg noted that Tenerelli appeared well and not in pain. Id. at 2, 3. Krieg again stated that Tenerelli's subjective complaints were "significantly out of proportion" to objective findings and observations, and that Tenerelli's response to "even very light touch on the upper back and neck [was] grossly excessive and inconsistent with normal patient behavior." Id. at 4. At sick call encounters on December 28 and 30, providers noted that Tenerelli had weakness and a shuffling gait. ECF Nos. 52-50, 52-51. Despite reporting numbness, Tenerelli could feel palpations during the exam on December 30. ECF No. 52-51, at 3.

On January 4, 2016, Tenerelli reported to sick call with pain between an eight and nine, but the provider observed that his pain appeared "out of proportion to his body habitus and demeanor." ECF No. 52-52. At a visit on January 6, Krieg explained to Tenerelli that he had faxed copies of Tenerelli's recently completed SPE and urine analysis tests to a doctor at the Mayo Clinic for review. ECF No. 52-53, at 4. On January 8, Krieg entered an administrative note stating that Tenerelli's ESR was elevated again at sixty-three. ECF No. 52-54. Krieg then followed up with the doctor at the Mayo Clinic and asked for review of the previously provided results and informed him of Tenerelli's elevated ESR. Id. At this point in time, the bone scan was still pending. Id. The Mayo Clinic doctor responded to Krieg on January

14

13, and recommended that Tenerelli be referred to a hematologist
to investigate the possibility of myeloma.  ECF No. 52-56.  Krieg
entered a request for a hematology consult and ordered a bone
survey to be performed.  Id.  The results of the bone survey,
performed that same day, showed "no discrete lytic lesions or
pathologic fractures ... to suggest [MM]."  ECF No. 52-57.

On January 19, Tenerelli reported that the numbness had spread
to his stomach, pelvis, and calves.  ECF No. 52-59, at 1.  His
pain was at a level eight, and he reported needing to strain while
urinating.  Id.  Tenerelli was told of the results from his bone
survey and was advised that his bone scan and hematology consult
were upcoming.  Id. at 2.  Tenerelli's bone scan took place on
January 21, and he had his consult with a hematologist at the Mayo
clinic on January 22.  ECF Nos. 52-60, 52-62.  The hematologist
spoke with Tenerelli about the possibility of MM, but noted that
it is extremely rare.  ECF No. 52-63.  The hematologist requested
additional expedited labs, which Krieg promptly ordered.  ECF No.
52-62.  Krieg also re-sent lab results that the hematologist
requested.  Id.

Tenerelli's condition deteriorated rapidly beginning on
January 24.  On that day, Tenerelli complained of numbness from
his stomach down.  ECF No. 52-64.  On January 25, Tenerelli
presented to sick call and complained of continued numbness and
difficulty walking.  ECF No. 52-65.  The provider noted that

CASE 0:18-cv-00629-DSD-DTS   Doc. 61   Filed 09/30/20   Page 16 of 23

Tenerelli appeared distressed and in pain, and observed that he was now using a walker. Id. Tenerelli requested an MRI, but Krieg declined to order one as it had not been recommended by the consulting physicians at the Mayo Clinic. ECF No. 52-66. Krieg did order a follow-up consultation with the Mayo Clinic hematologist to discuss a bone marrow biopsy. Id. On January 26, Tenerelli presented to sick call with continued complaints of numbness from his chest to his feet and reported that he was no longer able to push or strain while urinating. ECF No. 52-67, at 1. An exam revealed slight weakness in Tenerelli's left arm and right leg, as well as weakness in his gait. Id. at 4. Tenerelli could not differentiate between sharp and dull touch on his legs and abdomen, and his ESR was elevated at ninety-six. Id. The provider decided to admit Tenerelli to a medical floor for further evaluation. Id.

Once on the medical floor, the provider performed a full history and physical workup on Tenerelli. ECF No. 52-69. On completion, the provider noted his concern regarding Tenerelli's condition and recommended an MRI and potential neurology consult. Id. at 11. Tenerelli was taken to the Mayo Clinic emergency department on January 28 where an MRI and CT biopsy were performed. ECF Nos. 52-74, 52-75. These tests revealed a "severe pathological compression fracture of the T3 vertebra with a large amount of epidural and paraspinal tumor." ECF No. 52-74. Based on these

16

results and the negative bone scan performed on January 22, the provider stated that MM was the likely cause.  Id.  Tenerelli was transferred to the radiology/oncology department at the Mayo Clinic, and providers made an official diagnosis of MM on February 7, 2016.  ECF No. 52-76, at 1; ECF No. 52-78, at 1.  Tenerelli began treatment for MM shortly thereafter.  See ECF No. 52-81.

Tenerelli filed his complaint against Krieg and the United States on March 6, 2018.  The parties proceeded through discovery, and on November 25, 2019, Krieg moved for summary judgment on Tenerelli's Eighth Amendment claim.

## DISCUSSION

### I.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.

17

Id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

## II.  Legal Liability Standards

### A.  Bivens Liability

Tenerelli's claim against Krieg is brought pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), which created an implied cause of action against federal employees who violate a person's constitutional rights. Federal officials may, however, be protected from Bivens liability under the doctrine of qualified immunity.  An official will be immune from Bivens liability unless (1) the facts alleged by the plaintiff show the official's conduct violated a constitutional right of the plaintiff and (2) that right was clearly established such that a reasonable official would have known that his actions were unlawful.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The "dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." Id. at 202. The facts must be considered in the light most favorable to the plaintiff. Id.

B. **Eighth Amendment Deliberate Indifference**

The alleged constitutional violation in this case is that of Tenerelli's Eighth Amendment right to receive adequate medical care while incarcerated. See Estelle v. Gamble, 239 U.S. 97, 106 (1976). "It is well established that '[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment.'" Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010) (quoting Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006)). The standard to establish a violation of the Eighth Amendment requires both an objective and subjective analysis. Letterman v. Does, 789 F.3d 856, 861-62 (8th Cir. 2015). To succeed on his Eighth Amendment claim, Tenerelli must show that: (1) he suffered an objectively serious medical need, and (2) Krieg actually knew of but deliberately disregarded that need. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

Under the objective analysis, "a plaintiff must show there was a substantial risk of serious harm to the victim ...." Letterman, 789 F.3d at 861 (citing Gordon, 789 F.3d at 862). Krieg does not dispute that Tenerelli suffered from a serious medical

19

need and that MM presents a substantial risk of serious harm to a patient.

Next, under the subjective analysis, a plaintiff must show that the defendant was deliberately indifferent to that risk of harm. _Letterman_, 789 F.3d at 862. To establish deliberate indifference, a plaintiff must show that the defendant "recognized that a substantial risk of harm existed _and_ knew that their conduct was inappropriate in light of that risk." _Id._ A plaintiff may not rely on evidence that shows mere negligence or gross negligence on the part of the defendant. _Barton v. Taber_, 820 F.3d 958, 965 (8th Cir. 2016). Rather, the subjective component "requires a mental state akin to criminal recklessness." _Id._ The requisite "mental state can be inferred, however, from facts that demonstrate that a medical need was obvious and that the [defendant's] response was obviously inadequate." _Id._ (citation omitted).

Finally, although the plaintiff has a right to adequate medical care, he "ha[s] no right to receive a particular or requested course of treatment." _Barr v. Pearson_, 909 F.3d 919, 921 (8th Cir. 2018) (quotation omitted). Therefore, a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." _Id._ at 921–22 (quotation omitted).

### III. Tenerelli's Claim Fails on Deliberate Indifference

Tenerelli does not appear to dispute that Krieg did not have actual knowledge of his serious medical condition, i.e. that he had MM, leading up to the eventual diagnosis in February 2016. Instead, Tenerelli argues that Krieg should have known, based on the signs and symptoms exhibited, that he was suffering from a serious medical condition.  Tenerelli asserts that Krieg should have done more — including ordering an MRI, or a CT scan, or a consult with a neurologist — to determine the cause of his pain, and that by failing to do so he exhibited deliberate indifference to Tenerelli's serious medical needs.

Although Krieg concedes that "the symptoms Tenerelli was complaining about in retrospect [were] all 100 percent consistent with [a] spinal tumor," see Krieg Dep. 111:10–14, such retrospective recognition of the problem does not rise to the level of criminal recklessness required to establish an Eighth Amendment violation.  See Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000); Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997).  Indeed, both Tenerelli's and Krieg's experts agree that chest and back pain can have myriad causes.

Krieg and the medical team at FMC Rochester made multiple attempts to diagnose the cause of Tenerelli's pain.  They ordered x-rays, testing, and consultations with specialists at the Mayo Clinic.  When Mayo Clinic specialists recommended further testing,

Krieg complied with those recommendations.  Multiple diagnoses were ultimately made that could explain the cause of Tenerelli's pain, including GERD, costochondritis, esophagitis, and degenerative back issues.  Treatments for these various ailments alleviated the pain at times, and providers attempted to adjust treatment when needed.  Providers also considered other conditions that could cause Tenerelli's problems, such as PMR, and sought consultations to rule that out.

Tenerelli also cannot show deliberate indifference based on Krieg's failure to act more quickly when Tenerelli started exhibiting neurological symptoms such as tingling, numbness, and weakness in September.  This is because these were not all new symptoms for Tenerelli.  He had complained of tingling and numbness as far back as 2012, and in September 2015 he stated that the feeling of full-body numbness was normal for him.  Further, multiple providers indicated that an objective evaluation of Tenerelli's symptoms did not always match with his subjective complaints.  Although Tenerelli reported weakness and numbness, objective testing of these symptoms did not always support his subjective complains.  Given these inconsistencies, the court cannot conclude that Krieg exhibited a level of indifference akin to criminal recklessness.  As a result, Tenerelli cannot establish a violation of his Eighth Amendment right to adequate medical care and Krieg is entitled to immunity on this claim.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.    The motion for summary judgment [ECF No. 36] is granted;

2.    The claim against Krieg is dismissed with prejudice; and

3.    Krieg is dismissed from this suit.


Dated: September 30, 2020

                                    s/David S. Doty
                                    David S. Doty, Judge
                                    United States District Court

23